IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 19, 2002 Session

## STATE OF TENNESSEE v. CHRISTOPHER A. DAVIS

**Appeal from the Criminal Court for Davidson County**
**No. 96-B-866     J. Randall Wyatt, Judge**

**No. M2001-01866-CCA-R3-DD - Filed March 25, 2003**

The Appellant, Christopher A. Davis, was found guilty by a jury of two counts of first degree murder, two counts of especially aggravated robbery, and two counts of especially aggravated kidnapping.  The jury sentenced the Appellant to death for each of the first degree murder convictions.  The Appellant presents the following issues in this appeal as of right: (1) The trial court erred by not granting the Appellant's motion to disqualify the Davidson County District Attorney General's office from prosecuting the case; (2) the trial court erred by not granting the Appellant's motion to prohibit the State from relying upon the Appellant's prior murder conviction as an aggravating circumstance, because the conviction was for a crime committed while the Appellant was a juvenile; (3) the trial court erred by not suppressing the statement the Appellant made to police; (4) the trial court erred by denying defense counsel's motion to be allowed to withdraw from representing the Appellant; (5) the trial court erred by granting the State's motion to require the Appellant to supply the State information concerning mental health expert testimony to be presented during the sentencing phase of the  trial; (6) the trial court erred by allowing a physician who did not perform the autopsy to testify concerning the autopsy and evidence obtained in connection therewith; (7) the trial court erred in allowing victim impact evidence to be introduced; (8) that the evidence presented at trial was insufficient to support a finding of guilt beyond a reasonable doubt; (9) that the evidence presented was insufficient to support the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt; (10) that the evidence presented was insufficient to support a finding that the aggravating factors were established beyond a reasonable doubt; (11) that Tennessee's death penalty statutory scheme is unconstitutional in several instances; (12) that the trial court erred in allowing certain cross-examination of defense witnesses; and (13) that the cumulative effect of errors made at trial denied the Appellant a fair trial in violation of his due process rights.  Based on our review of the record on appeal, we affirm both the Appellant's convictions and the sentences imposed.

**Tenn. Code Ann. § 39-13-206 Death Penalty Appeal; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

Herschell D. Koger, Pulaski, Tennessee, for the Appellant, Christopher A. Davis.

Paul G. Summers, Attorney General and Reporter; Gill R. Geldreich, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Tom Thurman and Katrin Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.


## OPINION

The Appellant, Christopher A. Davis, was found guilty by a jury of two counts of first degree premeditated murder, two counts of first degree felony murder, two counts of especially aggravated robbery, and two counts of especially aggravated kidnapping, following the deaths of D'Angelo Lee and Gregory Ewing. The felony murder convictions were merged into the premeditated first degree murder convictions. The jury found three aggravating circumstances: (1) The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, Tenn. Code Ann. § 39-13-204(i)(2); (2) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another, Tenn. Code Ann. § 39-13-204(i)(6); and (3) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb, Tenn. Code Ann. § 39-13-204(i)(7). Finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, the jury sentenced the Appellant to death on both convictions of first degree murder. Additionally, Appellant was sentenced to two concurrent twenty-five year sentences for the especially aggravated robbery convictions and two concurrent twenty-five year sentences for the especially aggravated kidnapping convictions.


## FACTS

On February 28, 1996, at approximately seven o'clock a.m., the bodies of D'Angelo Lee and Gregory Ewing were discovered by Johnson Sullivan, the supervisor of a construction site in the Berry Hill area of Nashville. He stated that at approximately six o'clock in the morning, he first noticed that something was awry at the construction site. Initially, Mr. Sullivan thought someone had dumped trash in a remote area of the construction site, but he subsequently discovered that the trash he thought he had earlier seen was in fact two bodies. Mr. Sullivan's employer contacted the Nashville Metropolitan Police Department.

The area was immediately secured, and the police began their investigation. Detective Pat Postiglione went to the crime scene to assist Detective Mike Roland, the lead investigator, on the double homicide. Later that morning, detectives Pat Postiglione, Bill Pridemore, and Al Gray were investigating a tip they received from Crimestoppers that individuals named "Chris" and "Don-Don" living at 2716-B Herman Street in Nashville may have information related to the murder of a cab

driver near the Tennessee State University ("TSU") campus. The detectives arrived at the apartment between 10:00 and 11:00 a.m. Upon their arrival, they found Ronald Benedict, the lessee of the apartment and Antonio Cartwright, a fourteen-year-old. As the detectives were questioning them, Detective Pridemore noticed a rifle underneath a bed in an adjacent bedroom. The detectives then began to discuss the possibility of a search with Ronald Benedict. During this discussion, Dimitrius Martin, G'dongalay Berry, Brad Benedict and the Appellant, Christopher Davis, entered the apartment unannounced. Mr. Davis was talking on a cell phone at the time, and one of the other men was carrying an assault rifle[1]. The detectives announced who they were and drew their weapons. Davis, Berry, and Brad Benedict immediately turned and fled from the apartment. Ms. Martin remained.

The assault rifle was dropped outside the apartment during the chase. Detective Postiglione secured the weapon as the other detectives pursued the three men on foot. Detective Gray testified that he noticed that Davis was wearing house-shoes and began to chase him. Davis ran out of his house-shoes during the chase. Detective Gray saw Davis reach in his waistband several times. At one point, he saw Davis reach in his waistband, pull out a gun, and discard it in some bushes. After Detective Postiglione secured the assault rifle, he began to assist Detective Gray in the chase of Davis. Davis entered an alley during the chase, and the detectives were able to apprehend him at that time. Davis was caught approximately one block from the apartment. Detective Postiglione testified at trial that Davis told him his feet were hurting from running bare-foot in the gravel, which is why they were able to apprehend him. On cross-examination, Detective Postiglione admitted that he had not written this fact down in his report, but he remained steadfast that Davis made the statement. Neither Berry nor Brad Benedict were apprehended that day.

After his apprehension, Davis was placed under arrest. The detectives then recovered from the bushes the .45 caliber automatic handgun that Davis had discarded. Davis was taken back to the Herman Street apartment and placed in a marked patrol car. Detective Pridemore requested that Davis consent to a search of his bedroom, the room where Detective Pridemore had previously seen what he believed to be an assault rifle under the bed. Davis denied that he lived in the apartment. Davis was then transported in a marked car to the criminal justice center. The detectives testified that when he was arrested, Davis was wearing a gold cross necklace.

The detectives remained behind at the Herman Street apartment. Ronald Benedict consented to a search of the apartment, including Davis's bedroom. During the search, police found a nine millimeter handgun under a seat cushion of the sofa in the living room. The police also found and collected an M-1 carbine assault rifle, three SKS assault rifles, several other handguns, ammunition, a Crown Royal bag containing $1,400 cash, two pair of muddy gloves, a flashlight, a pair of muddy tennis shoes, a pair of handcuffs, a pager, a cell phone, and a black backpack containing cans of spray paint. Detective Postiglione also noticed a pair of green tennis shoes with yellow shoe laces, but those shoes were not collected.

---

[1]There is conflicting testimony as to whether the assault rifle was being carried by Mr. Berry or Mr. Benedict.

Antonio Cartwright was transported to the criminal justice center in the same car as Mr. Davis. Cartwright, however, was not handcuffed. Mr. Cartwright testified that during their transportation, Davis asked him to take a gold cross necklace off of his neck and put it in Davis's pocket. Cartwright testified that he did as Davis asked.

Dimitrius ("Dee") Martin, Davis's girlfriend, was also transported to the criminal justice center. She joined Davis at the police station, and they sat together for a period of time. Ms. Martin testified that Davis asked her to take a gold cross necklace from his pocket and put it in her purse. She stated that she had seen the necklace for the first time the night before when Davis put it around her neck. Ms. Martin further testified that while they were seated in the hallway at the police station, Davis told her that G'dongalay Berry and some others had gone to buy guns the night before. When Berry returned to the Herman Street apartment, someone was tied up in the trunk of the car Berry was driving and yet another person was tied up inside the car. Ms. Martin testified that Davis told her that he left with Berry and the others and they "drove out somewhere" and got the people who had been tied up out of the car. Davis then identified the people who had been tied up in the car by saying that Greg Ewing started pleading for his life. Davis told her that Berry began shooting the victims. Mr. Davis told Ms. Martin that he shot D'Angelo Lee. Davis requested that she call the Herman Street apartment and ask Maquana, Ronald Benedict's live-in girlfriend, to "get rid" of the green and gold tennis shoes that had been brought into the apartment the night before.[2]

Between 5:00 p.m. and 7:00 p.m. that evening, while Davis, Cartwright, and Martin were still detained at the police station, Detective Roland learned that Davis might be involved in the double homicides of D'Angelo Lee and Gregory Ewing. Based on the information Detective Roland received from other detectives, he interviewed Antonio Cartwright. Detective Roland next interviewed Ms. Martin. Thereafter, he questioned Davis in an interview room in the murder squad office. Detective Gray had previously questioned Davis that afternoon concerning the information received from Crimestoppers related to the murder of a cab driver near the TSU campus. Detective Roland testified that he confirmed with Davis that Detective Gray had read him his rights and that he understood the same. He asked if Davis was still willing to talk to him, and Davis responded yes. Davis denied any involvement in or knowledge of the Lee and Ewing murders. After approximately thirty minutes, Davis requested an attorney. At that point, Detective Roland ceased the interrogation. Detective Roland testified that the interview ended at approximately 9:45 p.m. For the next hour or so, Davis remained in the murder squad office, while the detectives continued to gather information on the double homicides. Detective Roland explained that the space is limited, and they did not want to put Davis back out in the hallway without supervision. Detective Roland testified that during that hour, he saw Davis resting on the floor at times and sitting in a chair at times. He also advised that he had been fed and given something to drink. Further, Detective Roland found a jacket for Davis to wear because he was cold.

---

[2] At trial, Ms. Martin admitted that when she was questioned by the police that day, she did not give them the information to which she had just testified. She stated that she was not truthful with the police when she was initially questioned. However, after she was arrested on different charges approximately one year later, she decided to be truthful with the police.

Family members of the victims identified evidence collected during the investigation as belonging to the victims. Specifically, family members identified the necklace Mr. Davis had given to Ms. Martin as belonging to one of the victims. Family members also identified a jacket that was found in Mr. Davis's bedroom as belonging to one of the victims. Detective Roland testified that based on the physical evidence collected from Davis's apartment and interviews with witnesses, he believed he had enough information for a criminal warrant for Mr. Davis in the double homicide case. Thereafter, Detective Roland began to type the warrant for Mr. Davis. He stated that as he was typing, Mr. Davis moved close to him and asked what he was doing. Detective Roland informed him that he was typing warrants for criminal homicide, and one was for him. At that point, Mr. Davis told Detective Roland that he wanted to talk to him.

Mr. Davis was taken to an interview room, where the interview was videotaped. Detective Roland stated that he again advised Davis of his rights. Mr. Davis waived his rights and signed a written waiver form. The videotaped statement began at approximately midnight and lasted approximately one hour. During the videotaped interview, Appellant stated that he wanted to cooperate. He advised that he did not commit the murders, but he had information about what occurred. He first stated that he was not present at the crime scene, but later recanted and stated he was present. He continued to deny, however, that he had played any role in the murders. He gave information regarding the weapons used, the scene of the crime, the time of the crimes, the manner in which the victims were murdered, and other people present at the murders.

It was Detective Roland's testimony that although Davis remained in the murder squad office, he never discussed the leads he was receiving regarding Davis's involvement in the murders with him. He also testified that he would leave the room and go into the hallway to discuss the new information with the other detectives. To his knowledge, none of the other detectives discussed any of the leads with or in front of Davis. Detective Gray explained that he did not discuss any of the leads in the investigation with Mr. Davis. He admitted, however, that his conversations with Detective Roland were not in secret. Detective Gray testified that he could not remember if either Ms. Martin or Mr. Davis were in the murder squad office during any of his conversations with Detective Roland. Detective Gray confirmed that he in no way made it known to Mr. Davis that the necklace had been identified. Detective Gray also testified that he did not divulge information related to the investigation to Detective Roland in front of Mr. Davis. Mr. Davis's attorney asked Detective Roland if he made any sort of announcement, intentionally or unintentionally, that he was typing warrants for the criminal homicides. Detective Roland responded that he did not. Detective Roland further testified that he did not recall Davis ever complaining of being sick until late in the videotaped statement. He admitted that he knew that Davis was tired, as he saw him lying on the floor resting. Detective Roland further admitted that although Davis requested an attorney, he never made a telephone call in his presence.

At a hearing on the Appellant's motion to suppress his statement, Mr. Davis testified that after he was taken to the police station, he was handcuffed to a chair. He stated that he remained there for several hours. According to Davis, his girlfriend, Ms. Martin, was in the hallway with him for a short period of time. He testified, however, that someone was watching them the entire time;

therefore, he could not really talk to her. At one point, he was taken into a room where someone asked pertinent personal information about him, including his name, social security number and address. Thereafter, he was returned to the hallway, where he was once again handcuffed to a chair. He stated that his girlfriend was questioned by Detective Gray for forty-five minutes to an hour. Detective Gray then questioned him in the murder squad office. He could not recall Detective Gray reading him his rights. At this point, Detective Gray was asking him questions about other crimes, and nothing was mentioned regarding the murders of D'Angelo Lee and Gregory Ewing. He informed Detective Gray that he had not eaten, and Detective Gray then purchased a cheeseburger, french fries, and drink for him. After eating only a few bites of the food, he recalled becoming nauseated and lying down on the floor for about an hour. He stated that he had slept for only a couple of hours the night before his arrest. Mr. Davis testified that Detective Roland interviewed him next. He stated that he could not recall Detective Roland giving him his <u>Miranda</u> rights. He further testified that no one prior to this interview had read him his rights. During the interview with Detective Roland, he advised that he wanted an attorney. He confirmed that the questioning stopped at this point.

According to Mr. Davis, later in the evening, Detective Gray brought in evidence that had been collected from his apartment. He testified that Detective Gray began "messing with me" about the evidence. When questioned further, he stated that Detective Gray asked him if he knew what the evidence was, who it belonged to, and where they had collected it. He specifically remembered being questioned about the necklace. He made no response. He stated that Detective Gray also showed him pictures of the bodies. He stated that although he had told Detective Roland that he wanted an attorney, Detective Roland questioned him again. Next, Mr. Davis testified that Detective Gray told him he needed to talk to Detective Roland and tell him everything he knew so that he could help Davis "get out of this." He remembered Detective Roland coming back in and then taking him to a different interview room. He stated that he did not recall his rights being read to him or signing a waiver of his rights. He said that he did not recall making the lengthy videotaped statement. He stated that he was very tired and sick that evening.

At trial, the State called Willie Mae Lee, D'Angelo Lee's mother. Ms. Lee was also Gregory Ewing's aunt. Ms. Lee testified that she last saw her son and Gregory at her house on February 27, 1996, at approximately 9:00 p.m. She stated that D'Angelo had asked to borrow her car, a white Cadillac. According to her testimony, D'Angelo was wearing a pair of green tennis shoes with yellow laces and a gold necklace. She identified the necklace collected from Ms. Martin at the police station on February 28, 1996, as her son's necklace.

Brenda Ewing Sanders, Gregory Ewing's mother, also testified on behalf of the State. Ms. Sanders testified that she last saw her son on February 27, 1996, when he came inside her home to use the telephone. D'Angelo was with her son, but remained outside. She identified the jacket recovered from the Herman Street apartment as belonging to her son. She further stated that he was wearing it the last time she saw him. She testified that Mr. Davis had been to her house earlier looking for Gregory, but she was not sure if it was the same day Gregory was murdered.

-6-

The State also called Antonio Cartwright, Dee Martin, Chris Loyal and Andre Kirby to testify regarding their knowledge of the events of February 27, 1996. At the time of their testimony, Martin, Loyal and Kirby were all incarcerated. Ms. Martin had charges pending against her for murder, especially aggravated kidnapping, especially aggravated robbery and eleven counts of aggravated robbery. She testified that she had not been promised anything in exchange for her testimony, but she hoped that she would get some consideration on her charges by testifying. Mr. Loyal admitted that he was serving time for highjacking. Mr. Kirby had been convicted of facilitation of first degree murder.

Ms. Martin testified that she had been at the Herman Street apartment with Davis during the day of February 27, 1996. She testified that she and Davis had planned to go to Kentucky that day, but had an argument en route and returned to Nashville instead. Mr. Davis had been out all night the night before, which in part caused the argument. While they were at the apartment the day of the 27th, they smoked marijuana.

Ms. Martin testified that she was in and out of the apartment in the late afternoon and evening of February 27, 1996. She testified that she went shopping at several different places. She testified, however, that while she was at the apartment, Davis received a page. He asked her to call the number back. D'Angelo Lee answered the telephone. Thereafter, she handed the telephone to Davis, and he had a conversation with Lee about buying guns from him. She believes this conversation occurred between 6:00 and 8:00 p.m.

Antonio Cartwright, who was fourteen years old at the time of the murders, testified that he arrived at the Herman Street apartment between 3:00 and 3:30 p.m.. He testified that Davis and his girlfriend, Ms. Martin, and Ronald Benedict and his girlfriend, Maquana Mederies, were all living in the apartment at the time. When he arrived, Mr. Davis, Yakou Murphy ("Kay"), G'dongalay Berry and someone named "Sneak" were present. He stated that they all smoked marijuana that afternoon. They were all in the front room of the apartment when Davis told them there was going to be a "highjacking deal and a gun deal" that night. Mr. Cartwright explained that D'Angelo Lee drove an Impala that was modified with hydraulics, a good stereo system and gold rims. Davis told them he wanted D'Angelo Lee's car. Davis explained to the group that he was going to call Lee to arrange a meeting under the pretense of buying guns. It was Cartwright's understanding that Lee had assault rifles and that Gregory Ewing would be with Lee. Davis told the group that Lee would trust him and would meet with him. Cartwright testified that Davis said when he met with Lee, he would "draw down on him" and take his car. Davis also asked Cartwright to participate by tying up Lee and Ewing. Cartwright said he could not do it. He knew both men and considered them friends. Davis told the group they would have to kill Lee and Ewing because the two men knew them and knew where they lived.

Cartwright testified that after the meeting with Lee was confirmed, Davis, Berry, "Kay," and "Sneak" left the apartment on foot. According to Cartwright, they each had a gun when they left. Davis had a nine millimeter handgun and a black backpack, and Berry had a .45 caliber pistol. Cartwright stated that the backpack had duct tape, rope, and handcuffs in it. Kay and Sneak returned

within 30 to 45 minutes, and they returned with the guns with which they had left the apartment. Davis and Berry returned 15 or 20 minutes later in a white Cadillac. Cartwright stated that when they returned, they had 4 or 5 assault rifles, pagers, green Nike tennis shoes with yellow laces, and a blue and black jacket. He also stated that Davis had a black .45 caliber pistol and a gold necklace with a cross on it. Cartwright testified that the assault rifles were put under Davis's bed, and the other items were placed in Davis's bedroom. Cartwright further testified that when Davis returned to the apartment, he said he had killed Lee and Ewing. Cartwright stated that Davis had told Lee to get in the trunk of the car, and Lee tried to get in with his .45 caliber pistol, but Davis got the gun from him. Davis said he cocked the gun, fired off a shot, and "drew down on him." Davis told Cartwright he shot Lee nine times in the head. Cartwright further testified that Davis told him he had dumped the bodies where they would not be found. Berry said in Cartwright's presence that they needed to burn the Cadillac.

Chris Loyal testified that he went to the Herman Street apartment the night of February 27, 1996, looking for Yakou "Kay" Murphy. When he arrived at the apartment, Ms. Martin, Cartwright, and Maquana Mederies were present. Approximately 15 to 20 minutes after he arrived, Berry and Davis arrived. Davis asked him to help take some assault rifles from a white Cadillac into the apartment. Mr. Loyal testified that he put the assault rifles in Davis's bedroom. He also saw some Kroger sacks and sheets that had drops of blood on them. He also remembered seeing a dark green backpack that had a lot of handguns in it. He said Davis was wearing a gold chain with a cross on it when he arrived at the apartment. He further testified that Davis appeared to be in charge, as he was giving out the orders.

After the items were brought into the apartment, Mr. Loyal stated that he left with Davis, Berry, and Yakou Murphy and went to a gas station. He stated that they left in a white Cadillac, which Berry was driving, and that everyone but him was wearing gloves. As they were en route to the gas station, Davis told him they had gone to get some guns and he "unloaded his clip." He said that the youngest of the two men began to cry or beg for his mother, and they shot him. According to Loyal, Davis and Berry were discussing amongst themselves what had happened. Loyal said it appeared that Davis and Berry were having a confrontation and Berry seemed to be upset about what had happened. Loyal testified Davis did not appear to be upset, just "hyper," "like it was a joke." He remembered seeing Davis and Berry each with a weapon. He further remembered seeing a nine millimeter handgun and a .45 caliber pistol, but he could not remember specifically which weapon Davis and Berry were holding. After they left the gas station, Loyal testified that they drove to Bordeaux, where he was dropped off.

Ms. Martin testified that she was at the apartment when Davis returned from the gas station. She testified that when Davis and Berry returned, they were carrying assault rifles, green and gold tennis shoes, a coat, and a black duffle bag. She said that the assault rifles were taken to Davis's bedroom and put under the bed. She further testified that the duffle bag was stocked with spray paint, ropes, handcuffs, and duct tape. She testified that she saw Davis, Berry and Loyal at a Circle K gas station on 28th Avenue at approximately 10:00 p.m. before she went back to the apartment for the last time that evening. After Davis returned to the apartment, she testified that she prepared

dinner for the two of them. She estimated that they ate around 11:00 p.m. Thereafter, Ms. Martin, Davis, Berry, and Brad Benedict went to a Scottish Inn on Bell Road. According to Ms. Martin, Davis fell asleep while en route to the hotel. When they arrived at the hotel, Davis left with Brad Benedict. He came back several hours later. She estimated that Davis slept for 4 to 5 hours that night at the hotel. She confirmed that he did not appear to be having any trouble getting around or going about his regular activities.

Near the end of her testimony, Ms. Martin read two letters that she had received from Davis following her incarceration. The letters advised Ms. Martin that she should "take the fifth" if asked to testify in his case. The letters further asked her not to testify in cases pending against other members of the Gangster Disciples. Ms. Martin was recalled by the defense during Davis's case in chief. She testified that Donald "Don-Don" Moore was Davis's best friend. Ms. Martin also admitted that she was a member of the Gangster Disciples, but said she did not become a member until after the murders of Lee and Ewing. When asked if Davis was the leader of the Gangster Disciples, she said she did not know.

Harold Andre Kirby also testified on behalf of the State. Mr. Kirby stated that in February 1996, he had loaned a nine millimeter handgun to Christopher Davis. It was his recollection that Davis had been arrested for the murders of the victims in this case the day after he loaned Davis the gun. He stated that around midnight or 1:00 a.m. of the day Davis was arrested, Davis appeared at his house. He testified that Davis was in a rush and kept asking him to leave with him. Kirby declined. He saw Davis run off his porch and get into a Cadillac. He saw him next at approximately 8:00 or 9:00 a.m. Davis showed him a .45 caliber handgun at that time. Kirby said he had never seen Davis with that gun before. Mr. Kirby stated that he was on the way to the Herman Street apartment later that morning to retrieve his nine millimeter handgun, but he saw police officers chasing after Davis, so he went home.

As previously discussed, Davis was apprehended during the late morning or early afternoon hours of February 28, 1996. At approximately midnight, Davis gave a videotaped statement to Detective Roland. Davis first denied any involvement in the murders. He stated that Berry and "Kay" (Yakou Murphy) left on foot to meet Lee and Ewing at Hadley Park. He stated they returned in the Cadillac with the men tied up in the car. He denied that anyone was placed in the trunk. He advised that D'Angelo was tied up in the front, and Greg was tied up in the back. Later, he recanted and said that after Berry, "Kay" and Sneak robbed the victims, they handcuffed D'Angelo Lee in the car and put Gregory Ewing in the trunk. Davis said that Berry returned to the apartment approximately 30 to 45 minutes later in a white Cadillac. He stated that he knew that Berry was going to buy the guns. In fact, he stated that he and Berry were each paying for one-half of the guns. He stated that he did not go with them because he was too sick. He advised Detective Roland that he stayed at the apartment with Dallas Blackman and smoked marijuana.

In the videotaped statement, Davis stated that when Berry returned, he brought the guns into the apartment, and "Kay" remained in the car. After denying that he was present at the murders, he recanted and said that when Berry returned to the apartment in the Cadillac, he got in the car with

them. He advised that Berry told them they were going "to let them walk." They drove south of town and Berry and "Kay" got Lee and Ewing out of the car. Davis said he then walked back to the car. He said Berry and "Kay" laid Ewing face down on the ground with his hands out. Davis heard Ewing say, "just don't kill us." According to Davis, Berry shot Ewing five times. "Kay" had already shot Lee four times in the back of the head. Davis said that Ewing was shot with the .45 caliber handgun, and Lee was shot with the nine millimeter handgun. He said they were dead by 8:30 p.m. on February 27. He stated they returned to his apartment. He told Detective Roland that the Cadillac had been burned, but he was not sure of its location. He further advised Detective Roland that Berry had the .45 caliber handgun used in the murders.

Danny Morris, a fingerprint identification specialist for the Metropolitan Nashville Police Department, testified that after the Cadillac was located, he tested it for fingerprints. He stated that the Cadillac had been burned; therefore, he could not recover any prints from the interior of the car. He stated that the only fingerprint he could identify with certainty was that of D'Angelo Lee. He lifted Mr. Lee's fingerprint from the trunk of the car. No other fingerprints were identifiable.

Dr. Bruce Levy testified on behalf of the State. He testified that he did not perform the autopsy of either of the victims. The medical examiners who had performed the autopsies were no longer employed by the Medical Examiner's Office. Further, they both lived out of state. Dr. Levy was allowed to testify after the trial court overruled the defense objections.

Dr. Levy explained that Gregory Ewing was shot a total of seven times. Gunshot wounds numbered 1 through 3 were injuries to the head and were life threatening injuries. Gunshot wounds 1 and 2 exited Mr. Lee's head. Gunshot wound number 3 did not exit. The bullet was recovered by Dr. Mizell who performed the autopsy. Gunshot wound number 3 was described as a medium caliber bullet. Gunshot wound number 5 was an injury to the right shoulder and that bullet was recovered during the autopsy. Gunshot wound number 6 was to the right upper portion of the abdomen, and it was a life threatening injury. This bullet was also recovered during the autopsy. Dr. Levy explained that the bullets from wound numbers 5 and 6 were from a larger caliber gun, meaning that they came from a different weapon than the bullet recovered from wound number 3.

Dr. Levy explained that the medical examiner's office has a standard procedure for securing bullets from bodies during an autopsy. He testified that when they recover a bullet, they secure the bullet, place it in a marked container, and lock it in an evidence locker. Later, they would turn the evidence over to the police. Dr. Levy then identified the bullets that were recovered from Gregory Ewing's body during his autopsy. He testified that each package has a label that is prepared by the medical examiner's office with a unique medical examiner case number. The label also contains the victim's name, date of death, police complaint number, the initials of the investigator who seals the envelope, a description of the evidence, and the location from which the bullet is recovered. Connected to the outside of the envelope is an evidence receipt acknowledging the transfer of the bullets from the property of the medical examiner's office to the property of the Metro Nashville Police Department. Dr. Levy stated that the envelope showed the initials G.M., the initials of Dr. George Mizell who performed the autopsy on Mr. Ewing. He further identified the remaining

information on the envelope. He testified that the bullets were transferred to Sergeant Hunter of the Metro Police Department on July 24, 1996, at 16:35 hours.

Dr. Levy next testified regarding the autopsy performed on D'Angelo Lee. Dr. Levy testified that Dr. Ann Bucholtz performed the autopsy. Mr. Lee was shot in the head three times and one or two times in the hands, depending upon how the wounds were interpreted. He stated that all three wounds to Mr. Lee's head were lethal. Further, no bullets were recovered from those three wounds, as each exited the body. Dr. Levy testified that wound number 5 was an abrasion wound, and they were unable to determine with certainty if it was an independent wound or a wound made by another bullet exiting the body. One bullet was recovered from the hand injuries. It was turned over to the Metro Police Department. Dr. Levy confirmed on cross-examination that he did not see the bullets as they were recovered from the victims and placed into the relevant packages; therefore, he could not say with certainty that the bullets placed into evidence were in fact the bullets taken from the bodies.

Tommy M. Heflin, supervisor of the firearms identification section of the TBI forensic services crime lab, testified on behalf of the State. Agent Heflin testified that he received four fired cartridge casings from a .45 caliber handgun, 8 fired nine millimeter cartridge casings, and one fired bullet from a .38/.357 caliber gun from Detective Roland who had recovered them from the crime scene. Agent Heflin also received four bullets recovered from Mr. Ewing's body during the autopsy– three fired .45 caliber bullets and one fired nine millimeter bullet. He further received one fired nine millimeter bullet recovered from Mr. Lee's body during the autopsy. Agent Heflin was also given two .45 caliber pistols for testing and one nine millimeter pistol.

After testing and comparing the nine millimeter casings with the nine millimeter gun, he stated he could not exclude the casings as having been fired from the nine millimeter gun. He could not say with absolute certainty that they were fired from the nine millimeter handgun he tested. However, they were either fired from that gun or one very similar. With regard to the four .45 casings, he was able to determine that all four were fired from the same gun, but not from either of the two .45 caliber handguns he was given for testing. Further, with regard to the .45 caliber fired bullets, he was able to determine that two of the fired bullets had definitely been fired through the barrel of the same gun. The third .45 caliber bullet had been damaged; therefore, he was unable to say with certainty that the third bullet was fired from the same gun. Agent Heflin was able to determine with certainty that the fired nine millimeter bullets that had been recovered from the bodies of Mr. Lee and Mr. Ewing during autopsies were fired from the nine millimeter pistol he was given by Detective Roland that was entered into evidence in this case. Agent Heflin further testified that the ammunition recovered from the Herman Street apartment was consistent with the projectiles and cartridges recovered at the crime scene.

Dr. Steven Wolff testified on behalf of the defense. Dr. Wolff testified that he had treated Mr. Davis at Vanderbilt Hospital for anemia. He stated that Mr. Davis was admitted to the hospital on February 18, 1996, and was released two days later. He stated that Mr. Davis was given a transfusion of red blood cells to treat his anemia. He stated that Mr. Davis had a lesion on his arm

that was consistent with a spider bite; therefore, they surmised that the anemia was probably caused by a spider bite. There was no definite finding, however. He further testified that it would be speculative to state what type of spider bit Mr. Davis, although they found a lesion near Mr. Davis's arm that was described as necrotic, which is characteristic of a brown recluse spider bite. Dr. Wolff testified that while Mr. Davis was in the hospital, he appeared to be normal. He was in no distress and acted appropriately. At discharge, Mr. Davis's red blood cell count was at 29%, which can be considered normal. He further stated that the combination of the transfusions Mr. Davis received and his hospitalization should have resolved his medical problem. Dr. Wolff stated that Mr. Davis had an appointment for a recheck on February 29, 1996, but by that time he was in custody. Dr. Wolff further admitted that if Mr. Davis had a traumatic injury resulting in blood loss after his hospitalization, his recovery could have been slowed.

Susie Boykin, Christopher Davis's grandmother, testified as an alibi witness for the defense. Ms. Boykin explained that Mr. Davis had lived with her off and on for several years. She stated that Mr. Davis came to her house on February 27, 1996 and ate dinner with her. She stated that he arrived at approximately 7:00 p.m. and stayed until 10:15 p.m. She said that although he was in and out of her house, she could hear him outside when he left. She further testified that she lived approximately five to six blocks from the Herman Street apartment. According to Ms. Boykin, Greg Ewing had stopped by her house prior to 7:00 p.m. looking for Mr. Davis. She told Mr. Davis that Ewing was looking for him, so he left and returned shortly thereafter. Mr. Davis told her that he had gone to Ewing's house, but he was not there. She remembered that at about 10:15 p.m. she asked Davis to stop running in and out of her house because she needed to go to sleep. On cross-examination, Ms. Boykin admitted that she had been interviewed by two investigators previously, and she never told either of them that Mr. Davis was at her house that night. She said neither investigator had ever asked her if he had been by her house that night.

Dallas Blackman, a friend of Mr. Davis, testified that he saw Mr. Davis at the Court Villa apartments on February 27, 1996, between 9:30 and 10:30 p.m.. He stated he was with him for approximately forty-five minutes. He testified that Mr. Davis asked him to rent a motel room for him that evening. Davis was with Antonio Cartwright at the time. Mr. Blackman admitted on cross-examination that he told Detective Roland a week before trial that he could not remember if he actually saw Mr. Davis on February 27 or another date, because it was common for Davis to ask him to rent a room for him.

The defense also called Yakou Murphy to testify. Mr. Murphy denied that he had murdered Mr. Ewing and Mr. Lee. He further denied that he had ever told anyone that he had in fact murdered the victims in this case. Mr. Murphy was asked by the defense if he witnessed Chris Loyal murder either of the two victims. He responded no. He denied any involvement in the murders of Lee and Ewing. On cross-examination, Mr. Murphy testified that Davis and Berry had asked him to go with them to buy guns. He testified that he, Davis, Berry, and Sneak left and went to Scobel Street. After arriving at Scobel Street, Mr. Murphy testified that he and "Sneak" went back to the Herman Street apartment. Before they got back to the apartment, he saw Davis and Berry in a white Cadillac, along with two other males. He did not know who the two other males were. Davis was driving the

Cadillac, and the two other men appeared to be tied up in the car. Mr. Murphy testified that when Davis and Berry left the apartment, they had two guns. He knew one was a nine millimeter, but he did not know what the other was. He testified that when Davis and Berry returned, they were carrying clothes, shoes and assault rifles. He said they took everything to Davis's bedroom. Mr. Murphy further denied that he knew either D'Angelo Lee or Gregory Ewing.

Donald Moore testified on behalf of the defense. Mr. Moore testified that Yakou Murphy told him that he murdered Lee and Ewing. Mr. Moore stated that Mr. Murphy told him that he tied them up, put them on their knees, and shot them. He further testified that Mr. Murphy said he had never liked Greg Ewing. Mr. Moore testified that Chris Loyal and two other men were with Murphy when he murdered Lee and Ewing, but Mr. Loyal stayed in the car while the victims were being murdered. Mr. Moore stated that Murphy told him he had set up Davis, Berry and Moore. On cross-examination, Mr. Moore admitted that he was Davis's best friend. He further admitted that he had been convicted of first degree murder, second degree murder, and especially aggravated robbery in unrelated cases. Mr. Moore stated that Mr. Murphy had testified against him in two of his cases.

Christopher Davis testified in his behalf at the trial, against the advice of his attorneys. Mr. Davis testified that he was eighteen years old in February 1996. He stated that he dropped out of school after completing the eleventh grade. Davis denied that he was a member of a gang, but admitted that he was a member of the Gangster Disciples organization. Davis further admitted that he had been selling cocaine since he was thirteen or fourteen years old. He stated that is how he made his livelihood.

He testified that prior to his arrest, he had been very sick. He testified that he was anemic and required hospitalization. He stated that he first went to General Hospital where he received a blood transfusion. He refused to continue to stay at the hospital, and checked himself out. A few days later, someone took him to Vanderbilt Hospital because he was so sick and weak. He testified that he was hospitalized for two days and the only reason he was discharged at that time was because he was requesting to leave. He learned at Vanderbilt Hospital that he had been bitten by a spider. He testified that he continued to be sick and weak following his discharge from Vanderbilt.

Davis testified that on the night of February 26, 1996, he had gotten into an altercation with a man when he was trying to buy marijuana. He stated the man hit him in the head with a shotgun barrel, which caused him to bleed profusely.

Mr. Davis testified that he had been at the Herman Street apartment most of the day on February 27, 1996. He testified that at approximately 6:45 to 7:00 p.m., he went to his grandmother's house on Scobel Street. He confirmed that he went to Greg Ewing's house looking for him. He stated that he spoke to Greg's mother, Brenda. He then returned to his grandmother's house, where she was cooking. He estimated the time to be 7:15 to 7:20 p.m. He then went back to his apartment. When he left the apartment, Antonio Cartwright was there alone smoking marijuana and drinking beer. He again returned to his grandmother's house where he went in and

out during the night, to sell cocaine nearby. On one of the trips out of his grandmother's house, he stated he saw Dallas Blackman and asked him to rent a hotel room for him for the night.

Mr. Davis testified that at one point his grandmother asked him to stop going in and out of her house. He went to kiss her goodnight and asked her what time it was. She responded that it was 10:15 p.m. He left his grandmother's house for the last time and returned to the apartment. Davis admitted that he never told the police that he had been to his grandmother's house that night. He stated that he probably would have told the police whatever they wanted to hear.

After he returned to the apartment, Chris Loyal appeared. Yakou Murphy arrived a short time later. Yakou asked them to help him and Berry get some things out of the car. He testified that the items previously referenced were brought into the apartment and placed in his bedroom, which action he protested. Thereafter, he and Chris Loyal got in the backseat of the car and went to the store with Berry and Murphy. On the return trip to the apartment, Davis said that Berry asked if he wanted to buy a necklace from him. He agreed and paid him $200. At the apartment, Berry dropped off Davis and Murphy. He and Murphy then located Dallas Blackman in order to get the hotel room for the night. Davis testified that while he was in the car with Murphy, he asked Murphy about the events of the night. Murphy allegedly responded that they had robbed someone, but he would not give any further details.

Later in the evening, Davis testified that he, Brad Benedict, and Berry were smoking marijuana at the hotel. He testified that when he continued to press Berry for details, Berry told him that he and Murphy had shot D'Angelo Lee and Greg Ewing. Davis said that Berry told him that they took them down south. A car went by and they had to get down in some bushes or weeds. After the car passed, Berry told him that Murphy immediately opened fire. Berry told him that he then started shooting also. According to Davis, Murphy shot D'Angelo Lee. Berry said he shot Ewing in the knee and then shot him a couple more times before Murphy came across and shot Ewing in the head two or three times.

On cross-examination, Davis admitted that his statement to the police was "one big lie." He further denied that Harold Kirby had ever loaned him a nine millimeter pistol.

The jury returned a verdict of guilty on all counts.

At the sentencing hearing, the State first presented proof of Appellant's prior convictions: a conviction of first degree murder and a conviction for attempted second degree murder. Next, the mothers of the victims testified. Both mothers explained their close relationships with their respective sons. Each mother also testified that her son had fathered children who were directly affected by the murders.

The defense presented testimony from Appellant's family members. Appellant's mother was college educated and maintained steady employment, whereas Appellant's father stayed home with the children to sell drugs. Both of Appellant's parents were drug addicts, and Appellant's father sold

drugs from their home in front of the children. Although Appellant's parents remained married, they did not have a loving relationship. Because of his parents' drug use, Appellant spent a lot of time with his grandmother, Susie Boykin. Appellant's father was incarcerated on several occasions related to drug charges. Because of his incarcerations, Appellant's father testified that he did not have a close relationship with his son.

The witnesses testified that through Mrs. Davis's employment and Mr. Davis, Sr.'s drug dealing, they were able to provide a very nice lifestyle for their children. Appellant attended a private school into his high school years "because he was very bright and a fast learner." Appellant was listed in the Who's Who Among American High School Students when he was in the eleventh grade. Appellant's mother admitted, however, that Appellant was expelled from St. Vincent's School for threatening a teacher. He later attended Pearl-Cohn High School, but did not graduate. The witnesses denied that Appellant was ever physically or sexually abused. Moreover, despite the problems, the witnesses testified that Appellant was loved by his family. Appellant's younger brother had been killed in a shooting incident in San Diego, California, about five months prior to Appellant's trial.

Donald Moore testified again during the sentencing phase. Mr. Moore testified that he first met Appellant when Appellant began dating his sister. He admitted that Appellant had sold marijuana and crack cocaine. He further advised that he and Appellant smoked marijuana every day. Mr. Moore stated that Appellant praised his father and his livelihood of selling drugs. According to Moore, Davis, Sr. was a very popular figure in the drug dealing community. Mr. Moore further testified that he, Appellant and G'dongalay Berry had smoked marijuana with Appellant's mother, Felicia Davis, on several occasions. Mr. Moore opined that after Appellant left private schools and began attending Pearl-Cohn High School, his attitude changed.

Marcus Lattimore, Appellant's second cousin, testified on behalf of the defense. He testified that he and Appellant had spent a lot of time together in their youth. He also testified concerning Appellant's early drug use and his family's drug use. Mr. Lattimore further testified that Appellant had been dealing drugs so he could open a recording studio and get into a different line of work.

On July 28, 2000, the jury sentenced the Appellant to death for the first degree murders of D'Angelo Lee and Gregory Ewing. The court subsequently sentenced the Appellant to two concurrent twenty-five year sentences for the especially aggravated kidnapping convictions and two concurrent twenty-five year sentences for the especially aggravated robbery convictions.

## ANALYSIS OF ISSUES

### I. Disqualification of the Davidson County District Attorney General's Office

Pretrial, Appellant filed a motion to disqualify the Davidson County District Attorney General's Office. Appellant's argument for disqualification centered around the fact that the trial judge's former law clerk, Philip Wehby, had joined the Davidson County District Attorney General's office as a prosecutor. At the hearing on Appellant's motion, Mr. Wehby admitted that while he was employed as a law clerk for Judge Wyatt, he had attended one, possibly two, ex parte proceedings concerning this proceeding. He further testified that following his employment in the District Attorney's office, he had not spoken to anyone regarding Mr. Davis's case. Moreover, he testified that no one had asked him for information regarding the case. When asked if he was aware that Mr. Davis's file was kept in General Thurman's office and not in open areas where it could be examined, he responded that he did not even know where the file on the Davis case was kept. He admitted, however, on cross-examination that he was not aware of any written policy of the Davidson County District Attorney General's office regarding screening lawyers in conflict of interest matters. He further stated that there had been no explicit order from the District Attorney's office that he be segregated from the Davis case, but he confirmed again that no one had approached him regarding the Christopher Davis case. Judge Wyatt ruled that while his former law clerk was prohibited from any participation in the case, the office of the Davidson County District Attorney General was not disqualified from the case. As a result, the Davidson County District Attorney General's office continued to prosecute the case. The Appellant filed an application for interlocutory appeal with this Court on this issue, and the interlocutory appeal was denied.

Most cases that have analyzed disqualification issues have considered first, whether an individual lawyer must be disqualified and second, whether disqualification should be required of the office in which the lawyer is employed. Judge Wyatt resolved the first issue when he ruled that Philip Wehby should have no participation in the case; Wehby was disqualified. The issue for this Court to determine is whether Judge Wyatt should have disqualified the entire district attorney general's office.

In State v. Tate, 925 S.W.2d 548 (Tenn. Crim. App. 1995), this Court held that the Knox County District Attorney General's office was disqualified from the prosecution of Richard Arthur Tate's case because former Judge Randall Nichols accepted the position of District Attorney General for Knox County after acting as presiding judge on pretrial matters in Mr. Tate's case. As judge, General Nichols presided over several ex parte proceedings wherein confidences regarding funds for expert services were disclosed. Id. at 549. After accepting the position of District Attorney General, General Nichols had as many as four lengthy discussions with the assistant attorney general assigned to prosecute Tate. Id. However, General Nichols and the assistant district attorney denied that General Nichols disclosed any facts that were not already known to the prosecution. Id. This Court ruled that General Nichols must be disqualified from the prosecution. Id. at 554. Next, the Court held that the entire office of the Knox County District Attorney General must be disqualified and a

new prosecution team appointed.  Id. at 558.  In so doing, this Court provided guidance for the resolution of the issue at bar.

As noted in Tate, Tennessee has adopted the majority position that an entire district attorney general's office need not be disqualified so long as the attorney at issue does not disclose confidences or otherwise participate in the prosecution.  Tate, 925 S.W.2d at 556 (citing Mattress v. State, 564 S.W.2d 678, 680 (Tenn. Crim. App. 1977)).  The Tate Court made it clear that the burden of proof rests upon the State to establish that appropriate screening measures have been taken when it quoted from the unreported case of State v. Claybrook, No. 3, 1992 WL 17546, at *11 (Tenn. Crim. App. at Jackson, Feb. 5, 1992) as follows: "[T]o avoid disqualification, it should be incumbent upon the state to prove by clear and convincing evidence that the challenged attorney has been sufficiently screened from the remainder of the staff and its work on the pending case." Tate, 925 S.W.2d at 557-58 (quoting State v. Claybrook, supra).

At the hearing on this issue before Judge Wyatt, Philip Wehby testified that he had not discussed the prosecution of Christopher Davis with anyone in the district attorney general's office.  Further, he explained that no one from the district attorney general's office had discussed the case with him or asked him questions regarding the same.  He admitted, however, that he knew of no formal screening procedure in place for conflict matters in that office.  Further, Mr. Wehby admitted that no specific order had been given to him to refrain from participation in the prosecution of Mr. Davis's case.

In addition to Tate, Appellant relies on Lux v. Commonwealth, 484 S.E.2d 145 (Va. Ct. App. 1997) to support his argument that the district attorney general's office in this case should have been disqualified.  Lux followed the majority rule in determining that per se disqualification of the entire district attorney's office is not required, but disqualified the district attorney's office nonetheless. In Lux, an attorney who had formerly participated in the defense of the defendant joined the district attorney general's office during the defendant's appeal.  Id. at 147.  The court noted that although the argument was made by the Commonwealth's attorney during argument on the motion to disqualify that the district attorney's office had established a "chinese wall" to prohibit the attorney from participating in any proceeding against the defendant, no evidence was offered proving the existence or the nature of the screening procedures utilized.  Id.  The court then ruled that because the Commonwealth had failed to meet its burden of proving that effective screening procedures had been implemented to prevent disclosure of the defendant's confidences, the entire staff of the district attorney general's office was disqualified.  Id. at 152.  The court reasoned that in light of due process considerations, a criminal defendant's motion to disqualify the district attorney general's office should be granted "when the circumstances indicate that the defendant's former counsel in a related matter has not been effectively screened from contact" with the attorneys who are prosecuting the defendant.  Id.

The facts in the case at bar are distinguishable from Lux.  In this case, the State presented evidence through the testimony of Philip Wehby that he had not discussed, nor had he been questioned, regarding Appellant's case.  Moreover, when he was questioned as to whether he was

aware of the fact that Appellant's file was kept in General Thurman's office so that it could not be accessed, he responded that he was not even aware of where the file was kept. Thus, in this case, as opposed to Lux, the State did present evidence to rebut any presumption of shared confidences. Although, admittedly, Mr. Wehby was not aware of a formal, written screening policy, there was screening of Mr. Wehby from the prosecution of Appellant's case, as he had never discussed any aspect of the case with anyone in the office. Further, Mr. Wehby was not Appellant's former counsel. Rather, he was the law clerk to the judge who, at that point, had presided over Appellant's pretrial matters. As the Tate Court explained, "[a] trial judge does not have the same duties as defense counsel. There is a lesser degree of shared confidences." Tate, 925 S.W.2d at 557. Certainly, the trial judge's law clerk would also have a lesser degree of shared confidences.

The facts of Tate are also distinguishable from the case at bar. In Tate, the court found that General Nichols had failed to screen himself from the prosecution of the defendant's case. Tate, 925 S.W.2d at 557. General Nichols openly talked with the assistant district attorney assigned to the case and maintained a supervisory role over the case. Id. Philip Wehby neither discussed Appellant's case with anyone in the office nor did he have any supervisory role.

This Court relied on Tate in finding that the entire district attorney general's office was not disqualified where the Appellant's former lawyer, then employed as a public defender, later went to work in the district attorney general's office in State v. Steve Mason, No. 01C01-9603-CC-00103, 1997 WL 311900 (Tenn. Crim. App. at Nashville, June 6, 1997), appeal denied, Feb. 23, 1998. The proof presented by the State at the hearing on the motion to disqualify in Mason is similar to the proof established herein, except in Mason the challenged attorney testified that upon beginning employment in the district attorney general's office, he was instructed by the District Attorney not to have any contact with the prosecutors on any case in which the Public Defender was involved. Id. at *5. The Mason Court found there was no proof that the challenged attorney shared any information with the prosecutor for the case or that he participated in any capacity in the prosecution. Id. at *6. Relying on Mattress, the Court held that absent proof of disclosure of confidences or participation in the prosecution, disqualification of the entire district attorney general's office was unnecessary to preserve the appearance of a fair trial or to protect the Appellant's rights. Id. at *6 (citing Mattress, 564 S.W.2d at 680).

Although factually different from this case, our supreme court adopted a three step analysis to determine whether an attorney's prior representation mandates vicarious disqualification of the law firm to which he or she moves his or her practice:

1) whether a substantial relationship exists between the subject matter of the former and present representations.

2) whether the presumption of shared confidences which arise from its determination that the representations are substantially related has been rebutted with respect to the former representation.

3) whether the presumption of shared confidences has been rebutted with respect to the present representation.

Clinard v. Blackwood, 46 S.W.3d 177, 184 (Tenn. 2001). In Clinard, an attorney who represented a client in a boundary dispute matter later withdrew from representation of his client and subsequently moved his practice to the law firm that represented the adversary in the same matter. Id. at 180. The law firm set up screening procedures to prevent the newly hired attorney or his secretary from sharing information concerning the case with other attorneys or staff of the firm. Id. at 181. Under the three step analysis, the supreme court explained that under the first prong of the analysis, "[a] relationship is substantial when 'the subsequent representation is adverse to the matters at issue in the previous relationship' or when 'the lawyer was so involved in the matter that the subject representation can be justly regarded as a changing of sides in the matter in question.'" Id. at 184 (citation omitted). In this case, Mr. Wehby did not formerly represent the Appellant. However, in analogizing the three step analysis to this case, we find that Mr. Wehby's attendance at one, possibly two ex parte proceedings did not cause him to be so involved in the Appellant's case at Judge Wyatt's office to be regarded as "switching sides" when he became employed at the district attorney general's office. Thus, even under the analysis of Clinard, the district attorney general's office is not disqualified pursuant to the shared confidences/screening analysis.

However, our analysis does not end here. The supreme court also addressed disqualification under the appearance of impropriety standard set forth in DR 9-101 in Clinard.[3] The supreme court quoted Ethical Consideration 9-6 of the Tennessee Code of Professional Responsibility: "Every lawyer owes a solemn duty . . . to avoid not only professional impropriety but also the appearance of impropriety." Id. at 186. The court then held that "an appearance of impropriety exists 'in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the . . . representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.'" Id. at 187 (citing N.J. Rules of Prof. Cond. 1.7(c)(2); Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 565 (Tenn. 2001)). The court further analogized the case to baseball and found that the disqualified attorney "not only switched teams, he has switched teams in the middle of the game after learning the signals." Clinard, 46 S.W.3d at 188. The court then found that the client had communicated confidential information to the attorney who then allied with the opposition. Id. The court finally held that although screening procedures had been implemented, the appearance of impropriety remained, and the entire law firm to which the disqualified lawyer had moved was also disqualified. Id. at 189.

---

[3] This Court notes that effective March 1, 2003, the Code of Professional Conduct currently set forth in Supreme Court Rule 8, which is patterned after the American Bar Association's Model Code of Professional Conduct, will no longer govern the ethical conduct of Tennessee attorneys. Instead, the standards of ethical conduct for Tennessee attorneys will be governed by the Tennessee Rules of Professional Conduct, which is patterned after the American Bar Association's Model Rules of Professional Conduct. As the Supreme Court noted in Clinard v. Blackwood, 46 S.W.3d 177, 187 n.7 (Tenn. 2001), the results in imputed disqualification cases may yield different results under the new rules.

The facts of the case at bar are distinguishable from the facts of Clinard. Here, Mr. Wehby did not previously represent the Appellant. Instead, he attended one, possibly two ex parte proceedings as a law clerk. Under the facts of this case, as we have previously held, we find that Mr. Wehby was effectively screened from this case at the district attorney general's office. Unlike Clinard, the fact that Mr. Wehby was "benched" by his new employer does "ameliorate the public perception of an unfair game." See id. at 188.

This Court reviews a decision of the trial court on disqualification of the district attorney general's office under an abuse of discretion standard. Tate, 925 S.W.2d at 550. In this case, we cannot find that the trial court abused its discretion in failing to disqualify the Davidson County District Attorney General's Office. Disqualification cases must be determined on a case by case basis. Clinard, 46 S.W.3d at 184; Tate, 925 S.W.2d at 557 (citing Formal Ethics Op. 89-F-118). The facts of this case are such that disqualification of the entire office of the Davidson County District Attorney General was not warranted.

## II. The Juvenile Status of Appellant at the Time of Appellant's Prior Felony Conviction

Appellant filed a motion to prohibit the State from relying upon Appellant's prior murder conviction for the murder of Adrian Dickerson, because Appellant was seventeen years old at the time of the offense in that case. See State of Tennessee v. G'Dongalay Parlo Berry and Christopher Davis, No. M1999-00824-CCA-R3-CD, 2001 WL 1251240 (Tenn. Crim. App. at Nashville, Oct. 19, 2001). Appellant argued that a juvenile transferred to criminal court is not eligible for the death penalty; therefore, the State should be precluded from relying upon an offense that occurred while Appellant was a juvenile to support an aggravating circumstance in a subsequent capital case. The trial court denied Appellant's motion. In its order, the court stated that Appellant had failed to present any authority to support his position, and the court had been unable to locate any such authority.

Tennessee Code Annotated section 37-1-134(a) prohibits a juvenile transferred to criminal court and tried as an adult from being eligible for the sentence of death. It does not, however, preclude a conviction of the transferred juvenile from being used as an aggravating circumstance in a subsequent capital case. See Tenn. Code Ann. § 37-1-134(a). Likewise, Tennessee Code Annotated section 39-13-204(i)(2), the statutory aggravator allowing a previous felony conviction of a defendant to be admitted into evidence during the sentencing phase, does not limit previous violent felonies to convictions of adults only. See Tenn. Code Ann. § 39-13-204(i)(2) (Supp. 2001). Appellant has cited no authority in this state or within any jurisdiction to support his position. Appellant simply relies on the bald assertion that if a juvenile transferred to criminal court is not eligible for the death penalty, then it follows that a conviction resulting from the transfer should not be allowed as evidence of an aggravating factor in a capital sentencing hearing.

This Court may not judicially amend a statute. See Mooney v. Sneed, 30 S.W.3d 304, 306 (Tenn. 2000). Accordingly, this Court cannot undertake to rewrite the statutes as requested by Appellant. This issue is without merit.

## III. Appellant's Statement to Police

Appellant filed a motion to suppress his statements made to police. Appellant was first questioned at the criminal justice center after being detained outside his residence. At the time Appellant was apprehended, the police were unaware of his alleged involvement in the murders at issue. Mr. Davis was taken in a police car in handcuffs from his residence on Herman Street in Nashville to the criminal justice center. Appellant arrived at the criminal justice center at approximately noon on February 28, 1996. Appellant was first questioned by Detective Al Gray regarding his knowledge of the murder of a cab driver near the TSU campus in Nashville. Detective Gray advised Appellant of his Miranda rights prior to questioning him.

Detective Mike Roland testified that he first learned of Appellant's potential involvement in the murders of Lee and Ewing between 5:00 and 7:00 p.m. Detective Roland testified that he called Davis in to question him regarding the murders of Ewing and Lee and confirmed that Detective Gray had read Davis his rights and that he understood the same. He asked if Davis was still willing to talk to him, and Davis responded yes. Appellant denied any involvement. The interview with Detective Roland began at approximately 9:00 p.m. Detective Roland testified that at about 9:45 p.m., Mr. Davis requested an attorney. No further questions were asked at that point.

Thereafter, Detective Roland obtained additional information linking Appellant to the murders of Lee and Ewing. Approximately one hour later, while Detective Roland was typing an arrest warrant, Appellant approached him and asked what he was doing. Detective Roland advised Appellant that he was typing a criminal homicide warrant for him, and Appellant stated that he wanted to talk.

After Appellant advised Detective Roland that he wanted to talk to him, Appellant was taken to an interview room, where he was read his Miranda rights. Appellant then signed a written waiver. The interview, including the reading of Appellant's rights, was videotaped. During the videotaped interview, Appellant stated that he wanted to cooperate. He advised that he did not commit the murders, but he had information about what occurred. He first stated that he was not present at the crime scene, but later recanted and stated he was present. He continued to deny, however, that he had played any role in the murders. He gave information regarding the weapons used, the scene of the crime, the time of the crimes, the manner in which the victims were murdered, and other people present at the murders.

The evidence shows that during the time Appellant was detained at the criminal justice center, he was provided with food and drink by the detectives. Detectives also admitted that Appellant complained of his stomach being upset. Detectives further admitted that Appellant advised that he was cold, and they provided him with a jacket. While at the criminal justice center, Appellant appeared tired at times and lay down to rest. Appellant asserts that as the detectives were gathering evidence linking him to the crime, detectives made statements within his hearing range regarding the evidence. Further, Appellant asserts that he was also specifically questioned regarding

some of the evidence after he had requested an attorney. The detectives involved in the investigation denied his assertion.

Appellant's attorneys argue that Appellant's statements to police should be suppressed because all questioning should have ceased when Appellant first requested an attorney. Appellant further argues that he was in a weakened physical condition because he was still experiencing the aftereffects from a spider bite that he received a couple of weeks prior to his arrest.[4] Appellant asserts that his weakened physical condition from the spider bite, coupled with a lack of sleep and eating, rendered his statements involuntary. Appellant further argues that there was undue delay in taking him before the magistrate on the weapons charge, the charge for which he was transported to the criminal justice center. Appellant also asserts that a rapidly intensifying homicide investigation was being conducted near his vicinity, and that the subtle remarks made by detectives amounted to a tacit form of questioning. Essentially, Appellant's attorneys argue that the detectives's actions amounted to an interrogation. As a result of the foregoing, Appellant advances the argument that his statement to the police was involuntary. The trial court, however, found that considering the totality of the circumstances, Appellant's statement was voluntary.

Our supreme court succinctly enunciated the proper standard of review in motion to suppress cases as follows:

> Because issues of whether a defendant was placed into custody, interrogated, or voluntarily gave a confession are primarily issues of fact, we review these factual determinations by the trial court according to the standard set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Questions about witness credibility and "resolution of conflicts in the evidence are matters entrusted to the trial judge," and the "testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress." Our review of a trial court's application of law to the facts, however, is conducted under a *de novo* standard of review.

State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citations and footnote omitted), cert. denied, 534 U.S. 948, 122 S. Ct. 341, 151 L. Ed. 2d 258 (2001).

We will first address whether Appellant's statement should be suppressed pursuant to Tennessee Rule of Criminal Procedure 5(a) as advanced by Appellant. Tennessee Rule of Criminal Procedure 5(a) provides:

> Any person arrested except upon a capias pursuant to an indictment or presentment shall be taken without unnecessary delay before the nearest appropriate magistrate

---

[4]Appellant had been hospitalized for two days at Vanderbilt Hospital for anemia as a result of a spider bite approximately ten days prior to his arrest.

of the county from which the warrant for arrest was issued, or the county in which the alleged offense occurred if the arrest was made without a warrant unless a citation is issued pursuant to Rule 3.5. If a person arrested without a warrant is brought before a magistrate, an affidavit of complaint shall be filed forthwith. When an arrested person appears initially before a magistrate, the magistrate shall proceed in accordance with this rule.

It is without dispute that Appellant was arrested and taken into custody between 11:00 a.m. and 12:00 p.m. It is further without dispute that Appellant gave a statement to the police at approximately 12:00 a.m. and was then taken before a magistrate. Appellant asserts that this twelve to thirteen hour delay in taking Appellant before a magistrate constituted unnecessary delay pursuant to Tennessee Rule of Criminal Procedure 5(a).

In State v. Huddleston, 924 S.W.2d 666, 670 (Tenn. 1996), our supreme court held that if an individual is not brought before a magistrate within 72 hours, there has been "unnecessary delay." We cannot find that because Appellant was not taken before a magistrate for twelve to thirteen hours there was an unnecessary delay. Moreover, a confession obtained during a period of unnecessary delay is not automatically suppressed. Id.; see also State v. Carter, 16 S.W.3d 762, 769 (Tenn. 2000). Instead, a statement is to be excluded "only if an examination of the totality of the circumstances reveals that the statement is not voluntarily given." Huddleston, 924 S.W.2d at 670. To determine if a statement was voluntarily given, we must consider:

the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured [or] intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

Id. at 671 (quoting People v. Cipriano, 429 N.W.2d 781, 790 (Mich. 1988)).[5]

The trial court specifically cited the above referenced factors in its order. Based on the evidence presented at the hearing, the trial court found: the detectives were accommodating to Appellant's needs; the Appellant was advised of his constitutional rights on two occasions; Appellant waived his constitutional rights in an effort to exculpate himself from involvement in the murders; Appellant's demeanor indicated he was lucid and in full control of his mental and physical faculties; no evidence regarding Appellant's intelligence or educational level that would raise

---

[5]This Court had previously adopted the voluntariness test by adopting the Cipriano test in State v. Readus, 764 S.W.2d 770, 774 (Tenn. Crim. App. 1988).

questions regarding the voluntariness of the statement; no indication that Appellant's injury from the spider bite affected his decision making; and Appellant's statement lasted approximately one hour and was not conducted in an abusive or coercive manner. As a result, the trial court ruled that under the totality of the circumstances, Appellant's statement was voluntary.

With regard to this issue, we conclude that there was no violation of Tennessee Rule of Criminal Procedure 5(a). Moreover, we find that even if there was a violation, Appellant's statement should not be excluded because it was voluntary under the totality of the circumstances.

Next we must consider whether there was a violation of the Fourth Amendment that requires the suppression of Appellant's statement. The Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to the extended detention of an individual after a warrantless arrest. Gerstein v. Pugh, 420 U.S. 103, 114, 125, 95 S. Ct. 854, 863, 869, 43 L. Ed. 2d 54, 65, 72 (1975). The United States Supreme Court has determined that absent a bona fide emergency or extraordinary circumstance, a judicial determination of probable cause is "prompt" if it occurs within 48 hours. County of Riverside v. McLaughlin, 500 U.S. 44, 56-57, 111 S. Ct. 1661, 1670, 114 L. Ed. 2d 49, 63 (1991). The Supreme Court has explained that the probable cause determination does not pass constitutional muster simply because it occurs within 48 hours. Id. If a hearing is delayed unreasonably for the purpose of gathering evidence to justify an arrest, a delay is simply for delay's sake or a delay is motivated by ill will against the arrested individual, then it may not pass constitutional muster. Id. We find that here, Appellant was taken before a magistrate within 48 hours, and the determination of probable cause was not delayed unreasonably. Therefore, there was no violation of the Fourth Amendment and, therefore, no reason to suppress Appellant's statement pursuant thereto.

Appellant also argues that his statement was not voluntarily given because after he asserted his right to counsel, the police began a tacit form of interrogation by bringing incriminating evidence in front of him and conversing amongst themselves within his hearing range. Custodial interrogations must be preceded by Miranda warnings. Berkemer v. McCarty, 468 U.S. 420, 434, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984); Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Once the right to counsel has been invoked, the interrogation must stop, unless the person re-initiates the conversation and expresses a desire to talk to the police. State v. O'Guinn, 786 S.W.2d 243, 246 (Tenn. Crim. App. 1989). "Interrogation" encompasses any "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 1690, 64 L. Ed. 2d 297, 308 (1980).

At the suppression hearing, Appellant testified that as the detectives were gathering evidence linking him to the crime, they made statements within his hearing range regarding the evidence and specifically questioned him regarding some of the evidence after he had requested an attorney. The detectives involved in the investigation denied these allegations. According to the record, approximately one hour passed between the time Appellant asserted his right to counsel and next requested to speak with Detective Roland. This Court has previously noted that "[t]he disclosure

of incriminating evidence to a suspect . . . does not necessarily constitute interrogation within the meaning of Innis." State v. Maraschiello, 88 S.W.3d 586, 603 (Tenn. Crim. App. 2000) (citing Shedelbower v. Estelle, 885 F.2d 570, 573 (9th Cir. 1989); United States v. Vazquez, 857 F.2d 857, 861 (1st Cir. 1988)). After reviewing the record, we agree with the trial court that there is no evidence that the Appellant was coerced by any of the detectives into making the statement at issue. We find that the actions of the police do not constitute an interrogation under Innis.

With respect to the re-initiation of conversation by Appellant, the trial court specifically found that Appellant approached Detective Roland and initiated further conversation. The court noted that it accredited the testimony of Detective Roland on this issue. The court next found that Detective Roland twice advised Appellant of his constitutional rights, and Appellant executed a written waiver of his rights before resuming the interview. The court found no evidence that Appellant was coerced by any of the detectives into initiating the subsequent communication or that Appellant was otherwise engaged in any discussions about the case prior to the Appellant's request to resume the interview. Thus, the court resolved the conflicting testimony in favor of the detectives, rather than Appellant. We agree. Absent coercive activity by the police, we must conclude that the Appellant voluntarily initiated a dialogue with Detective Roland and made the statement at issue. See Maraschiello, 88 S.W.3d at 604. Moreover, Detective Roland twice advised Appellant of his Miranda rights once questioning resumed. Thereafter, Appellant made a knowing and intelligent waiver of his Miranda rights.

Further, we are not persuaded by Appellant's argument that his weakened physical condition from the spider bite, coupled with a lack of sleep and eating, rendered his statements involuntary. The trial court found otherwise. As previously set forth, under the totality of the circumstances, the evidence does not preponderate against the trial court's finding that Appellant's statement was voluntarily made.

As a result of the foregoing, we conclude that the trial judge did not err in denying the motion to suppress the Appellant's statement. Accordingly, this issue is without merit.

## IV. Counsel's Request to Withdraw from Representation

Prior to the trial of this case, Appellant's attorneys, Niles Nimmo and Hershell Koger, filed a motion to withdraw. However, the attorneys stated that due to ethical and professional obligations, they could not disclose the reasons withdrawal was required. Judge Wyatt transferred the matter to Judge Walter Kurtz for an ex parte hearing. Judge Kurtz held a hearing, and the transcript was placed under seal. Thereafter, Judge Kurtz issued a memorandum order denying the motion to withdraw, also under seal. Appellant filed an application for interlocutory appeal in this court, which was denied because Appellant refused to unseal the application, as required by Tennessee Rule of Appellate Procedure 9(d). Niles Nimmo was subsequently allowed to withdraw because Appellant filed a post-conviction petition alleging ineffective assistance of counsel by Mr. Nimmo in a prior proceeding. Mr. Koger, however, continued representation of Appellant at the trial and continues to represent Appellant on appeal.

On appeal, Appellant's attorney maintains that he is prohibited by ethical and professional considerations from unsealing the transcript or memorandum order. The State asserts because Appellant refuses to unseal the transcript and memorandum order, Appellant has not properly raised this issue for appeal. Moreover, the sealed transcript and memorandum order have not been included as a part of the record on appeal.

Tennessee Rule of Appellate Procedure 13(c) precludes this Court from considering facts outside the record. This Court has no basis to review Judge Kurtz's ruling on the withdrawal issue, especially in light of the fact that the sealed transcript and order are not before this court. Further, Appellant's attorneys have never asked that the transcript and order be unsealed.[6] "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Accordingly, this issue has been waived by Appellant.

## V. Notice of Intent to Present Expert Testimony of Mental Condition at Penalty Phase

Appellant contends that the trial court erred in granting the State's motion requiring Appellant to supply information to the State regarding mental health issues that would be presented at the sentencing phase of trial. Pretrial, the State filed a Motion to Compel Discovery of Expert Testimony, pursuant to Rules 12.2 and 16 of the Tennessee Rules of Criminal Procedure. In its motion, the State requested the court require the defense to file a written notice of its intent to introduce expert testimony relating to mental disease or defect, or any other mental condition at the guilt or penalty phase of the trial. The court granted the State's motion, and Appellant sought an extraordinary appeal on the issue, which was granted. Ultimately, the issue was decided by the supreme court in State v. Reid, 981 S.W.2d 166 (Tenn. 1998).[7]

The supreme court held that a defendant is required to file a pre-trial notice of his intent to present expert testimony regarding mental health condition as mitigation evidence at the sentencing phase of a capital trial. On appeal, Appellant asserts that the Supreme Court's decision in Reid contravenes Rules 12.2 and 16 of the Tennessee Rules of Criminal Procedure.

This Court is without the authority to overrule the Supreme Court's decision in Reid. See Thompson v. State, 958 S.W.2d 156, 173 (Tenn. Crim. App. 1997). The Supreme Court has

---

[6] Appellant has filed a *pro se* reply brief requesting that the transcript and memorandum order be unsealed for the limited purpose of review of this issue alone. However, the sealed documents are not a part of the record on appeal. Moreover, the Appellant is represented by counsel in the above-styled case, and it has long been the rule that an Appellant may not be represented by counsel in this Court and simultaneously proceed *pro se*. State v. Burkhart, 541 S.W.2d 365, 371 (Tenn. 1976); State v. Cole, 629 S.W.2d 915, 917-18 (Tenn. Crim. App. 1981). Accordingly, it is the responsibility of counsel to file all pleadings in this appeal.

[7] The Appellant's application for permission to appeal to the supreme court was consolidated with the application of Paul Dennis Reid on the same issue. The opinion of the court was filed and published as State v. Reid, 981 S.W.2d 166 (Tenn. 1998).

inherent power to make and enforce reasonable rules of procedure. Reid, 981 S.W.2d at 170. The Reid decision set forth the controlling law on this issue. Moreover, as Appellant was one of the parties who litigated this issue in Reid, he is bound by the law of the case. See State v. Jefferson, 31 S.W.3d 558, 560-62 (Tenn. 2000). This issue is without merit.

## VI. Testimony of Dr. Levy

Appellant filed a pretrial motion requesting that the court determine the proper scope of Dr. Bruce Levy's testimony at trial. Specifically, Appellant requested that Dr. Levy be prohibited from testifying regarding the autopsies of the victims, as Dr. Levy did not perform the autopsies. The autopsies were performed by assistant medical examiners who were no longer employed in the Davidson County Medical Examiner's Office. D'Angelo Lee's autopsy was performed by Dr. Ann Bucholtz, and Gregory Ewing's autopsy was performed by Dr. George Mizell. The court ruled that if the State laid the proper foundation at trial, the autopsy reports would be admissible as substantive evidence under Tennessee Rule of Evidence 803(6) as a business record, under Tennessee Rule of Evidence 803(8) as a public record, and under Tennessee Code Annotated section 38-7-110. Further, the court ruled that if the State laid the proper foundation for Dr. Levy's testimony as an expert, Dr. Levy would be permitted to express his opinions in his field and to communicate to the jury that he relied upon the autopsy reports in forming his opinion.

Prior to Dr. Levy's testimony, Appellant objected, stating that because Dr. Levy did not personally retrieve any bullets from the bodies of the victims or see the same performed, the State could not establish the proper chain of custody of the bullets. Appellant argued that there was, therefore, a break in the chain of custody of the bullets, and the court should not permit testimony regarding the bullets. The State countered that the absence of one person's testimony in the chain of custody does not invalidate the chain. Furthermore, the State argued that the court had previously ruled that Dr. Levy would be permitted to testify based on the business records and public records exceptions to the hearsay rule. The court allowed the bullets into evidence and stated again that it would allow Dr. Levy to testify. The court cautioned the State, however, that it must establish the chain of custody.

Dr. Levy testified that he did not perform the autopsies on the victims, but the office followed a definite procedure for recovering bullets from a body. He testified that when they recover a bullet, they secure it, place it in a marked container, and lock it in an evidence locker. Later, they turn the evidence over to the police. He testified that the bullets recovered from Gregory Ewing were marked with the appropriate case identification number and had the initials G.M. on the envelope. He could not testify as to the handwriting of the initials, but he noted that Dr. George Mizell performed Mr. Ewing's autopsy. He further noted that the bullets recovered from Gregory Ewing were turned over to Sergeant Hunter of the Metro Police Department.[8] Similarly, Dr. Levy testified that the bullets recovered from D'Angelo Lee were placed in a container with the appropriate case number and

---

[8] Sergeant Hunter had previously testified that he retrieved bullets that were recovered from Mr. Ewing's autopsy from the Davidson County Medical Examiner's office.

turned over to the Metro Police Department.[9]  Dr. Levy admitted that he did not watch the autopsies as they were performed; therefore, he could not testify based on his personal knowledge that the bullets that had been placed into evidence were in fact bullets recovered from the victims.  He stated that his testimony was based upon procedures followed in the medical examiner's office.

Following Dr. Levy's testimony, Appellant renewed his previous objection.    The court ruled that based on the testimony from the police officers regarding retrieval of the bullets from the medical examiner's office and the testimony of Dr. Levy that the proper procedure for securing and identifying the bullets had been followed, the proper chain of custody had been established by the State.  The court further ruled there was no suspicion surrounding the authenticity of the bullets.

The autopsy reports are admissible hearsay under Rules 803(6) and 803(8) of the Tennessee Rules of Evidence.  See also State v. Mario Hawkins, No. 01C01-9701-CR-00014, 1998 WL 352095, at *6-7 (Tenn. Crim. App. at Nashville, July 2, 1998).  Further the autopsy reports are admissible as a public document pursuant to Tennessee Code Annotated section 38-7-110. The court did not err in allowing Dr. Levy to testify in this regard.

It is a fundamental rule of law that the State must establish an unbroken chain of custody in order to present physical proof into evidence.  State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000); State v. Holbrooks, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998).  However, every witness that handled the evidence in the chain is not required to testify in order to establish a lack of tampering with the evidence.  Rather, the State is required to reasonably establish the identity of the evidence and its integrity.  Scott, 33 S.W.3d at 760; Holbrooks, 983 S.W.2d at 701.  This Court reviews the trial court's decision on whether the State has established the proper chain of custody of physical evidence under an abuse of discretion standard.

Based upon the evidence in the record and the trial court's ruling on the same, we conclude that the trial court did not abuse its discretion in determining that the State had met its burden of establishing the proper chain of custody.  This issue is without merit.

## VII.  Victim Impact Evidence

Appellant next argues on appeal that the court erred in allowing victim impact testimony to be admitted at the sentencing hearing through the testimony of the victim's mothers.  Specifically, Appellant argues that victim impact evidence is irrelevant at a capital sentencing hearing and therefore unconstitutional.  Appellant further contends that he was denied his right to confront the victims' children, as the mothers of the victims testified concerning the victims' children.

Victim impact evidence has been declared constitutional by the United States Supreme Court and the Tennessee Supreme Court.  Payne v. Tennessee, 501 U.S. 808, 827, 111 S. Ct. 2597, 115 L.

---

[9] Officer Merrill had previously testified that he retrieved the bullets that were recovered during the autopsy of D'Angelo Lee from the medical examiner's office.

Ed. 2d 720 (1991); State v. Nesbit, 978 S.W.2d 872, 889 (Tenn. 1998), cert. denied, 526 U.S. 1052, 119 S. Ct. 1359, 143 L. Ed. 2d 520 (1999). Moreover, Appellant's argument that he was denied the right to confront the victims' young children is similarly without merit. First, Appellant made no objection to the testimony of the victims' mothers that their grandchildren were confused and disturbed by their fathers' respective deaths. Appellant had the opportunity to rebut any evidence in this regard, but he chose not to do so. His decision not to challenge the testimony of the victims' mothers on this issue does not constitute a denial of confrontation. See Nesbit, 978 S.W.2d at 889-90 (citing Tenn. Code Ann. § 39-13-204(c) (1997) and explaining that the prosecution is allowed to introduce any evidence that is relevant to the issue of punishment, as long as the defendant is allowed a fair opportunity to rebut any hearsay statements so admitted). Accordingly, this issue is without merit.

## VIII.  Sufficiency of the Evidence

Appellant argues that the evidence is insufficient to support the findings of guilt beyond a reasonable doubt. Appellant relies primarily on the fact that the evidence was circumstantial. This issue is without merit.

In determining whether there is sufficient evidence to support the jury's verdict, this Court must determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985), cert. denied, 475 U.S. 1031, 106 S. Ct. 1240, 89 L. Ed. 2d 348 (1986). Moreover, this Court cannot re-evaluate the evidence or substitute its inferences for those drawn by the trier of fact. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999). Rather, this Court must view the evidence in the light most favorable to the State and afford the State all the reasonable and legitimate inferences that can be drawn from the evidence. Id.

Based on the record before this Court and viewing the evidence in the light most favorable to the State, this Court finds that the evidence is sufficient to support the jury's verdict of guilt of Appellant for two counts of first degree murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery, beyond a reasonable doubt. This issue has no merit.

## IX. and X.  Sufficiency of Aggravating Evidence

Appellant asserts that the proof is insufficient to support the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt and that the evidence at trial and sentencing was insufficient to support the jury's finding that the aggravating factors were established beyond a reasonable doubt.

In this case, the jury found the existence of three aggravating factors:
(2) The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;

(6) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and

(7) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. §§ 39-13-204(i)(2), -204(i)(6), and -204(i)(7) (Supp. 2001).

The evidence is uncontroverted that Appellant had a prior conviction for first degree murder. This Court has already determined, supra, that despite the fact that Appellant was a juvenile at the time he committed the prior offense, the conviction can be considered by the jury as an aggravating circumstance in a subsequent capital case. Thus, Appellant's argument with regard to this aggravating factor is without merit.

Aggravating factor (i)(6) is supported by Antonio Cartwright's testimony. Mr. Cartwright testified that Appellant told a group of people that he would have to kill Lee and Ewing because the two men knew them and knew where they lived. This issue is without merit.

Aggravating factor (i)(7) is supported by the testimony of Antonio Cartwright, Dimitrius Martin, and Chris Loyal. Each of these witnesses testified that the murders of Lee and Ewing were committed during the robbery and kidnapping of the victims. As a result, the evidence is sufficient to support the jury's finding with respect to this aggravating circumstance.

The evidence is further sufficient to support the jury's determination that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. Appellant presented several witnesses on his behalf during the sentencing hearing. Appellant argues that his proof regarding his cultural and family upbringing and circumstances outweighs the aggravating factors. However, this Court finds that based on the evidence in the record, this issue is without merit.

## XI. Constitutionality of Tennessee's Death Penalty Statute

Appellant contends that Tennessee's Death Penalty statute is unconstitutional in nineteen respects. He admits, however, that under current case law, the statute meets constitutional standards. Appellant fails to cite to any case law or other authority to support his contention that Tennessee's death penalty statute is unconstitutional. In fact, he makes no argument whatsoever. Under Rule 10(b) of the Rules of Court of Criminal Appeals, Appellant has waived this issue. Moreover, as Appellant admits, the death penalty statute has repeatedly been held constitutional. See e.g., State v. Keen, 31 S.W.3d 196, 233 (Tenn. 2000), cert. denied, 532 U.S. 907, 121 S. Ct. 1233, 149 L. Ed. 2d 142 (2001); State v. Nesbit, 978 S.W.2d 872, 902 (Tenn. 1998), cert. denied, 526 U.S. 1052, 119

S. Ct. 1359, 143 L. Ed. 2d 520 (1999); State v. Vann, 976 S.W.2d 93, 117 (Tenn. 1998), cert. denied, 526 U.S. 1071, 119 S. Ct. 1467, 143 L. Ed. 2d 551 (1999).

Appellant contends also that the aggravating factors applied in this case are unconstitutional. He concedes, however, that the relevant factors are facially constitutional under current law.

Further, Appellant contends that aggravating factor (i)(2) is not applicable to Appellant because Appellant's prior felony conviction was imposed after he was arrested on the charges in this case. Our supreme court reaffirmed in State v. Hodges, 944 S.W.2d 346, 357 (Tenn. 1997), cert. denied, 522 U.S. 999, 118 S. Ct. 567, 139 L. Ed. 2d 407 (1997), that if a prior conviction is received before the sentencing hearing, then factor (i)(2) is applicable. Therefore, this issue is without merit.

Next, Appellant contends that factors (i)(6) and (i)(7) overlap and therefore do not sufficiently narrow the class of death-eligible defendants in murder cases. Basically, Appellant argues that the factors have a similar purpose, to prevent killings that are exceedingly reprehensible, and therefore fail to narrow the class of death-eligible defendants in murder cases. However, the United States Supreme Court has ruled that the proper question is whether the factors "genuinely narrow the class of persons eligible for the death penalty." Arave v. Creech, 507 U.S. 463, 474, 113 S. Ct. 1534, 1542, 123 L. Ed. 2d 188, 200 (1993) (quoting Zant v. Stephens, 462 U.S. 862, 877, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983)). Only if the aggravating circumstance applies to every defendant who has committed the particular crime does the aggravating factor fail to narrow the class of death-eligible defendants. Arave, 507 U.S. at 474. In this case, the proof at trial showed that Appellant planned to kidnap and rob the victims and that he planned to kill them because they knew him and could identify him. Both factors (i)(6) and (i)(7) are applicable in this instance. The fact that two aggravating factors are applicable to the same situation does not render them unconstitutional.

## XII. References to Other Witnesses' Testimony by the Prosecution During Cross-Examination

Appellant argues that it was error for the court to allow the State's attorney to cross-examine defense witnesses by referring to the testimony of other witnesses and to contrast their testimonies in an argumentative fashion. Appellant concedes that he did not raise this issue in his motion for new trial, but he asserts that this Court should review this issue under the plain error doctrine.

To review an issue under the plain error doctrine, five factors must be present: the record must clearly establish what occurred in the trial court; a clear and unequivocal rule of law must have been breached; a substantial right of the defendant must have been adversely affected; the accused did not waive the issue for tactical reasons; and consideration of the error is necessary to do substantial justice. State v. Adkisson, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994); see also Tenn. R. Crim. P. 52(b). This Court does not find that a clear and unequivocal rule of law was breached. Further, the examples advanced by Appellant in his brief demonstrate that the prosecution was

attempting to test the veracity of the witnesses' testimony. These matters are within the sound discretion of the trial court, and we find no error. Accordingly, this issue is without merit.

## XIII. Cumulative Effect of Errors

Finally, Appellant alleges that the cumulative effect of the errors in the trial court effectively denied him a fair trial. Again, Appellant failed to raise this issue in his motion for new trial. Issues not presented to the trial court in a motion for new trial are waived on appeal. Tenn. R. App. P. 13. Notwithstanding, this Court has found no merit in Appellant's issues on appeal; therefore, there can be no cumulative effect. This issue is without merit.

## XVII. Proportionality Review

Finally, the sentences of death are not disproportionate to the penalty imposed in similar cases. In reviewing a defendant's sentence of death for first degree murder, "the reviewing court shall determine whether . . . the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Tenn. Code Ann. § 39-13-206.

> Our supreme court has explained comparative proportionality review as follows:
> In conducting a comparative proportionality review, we begin with the presumption
>
> that the sentence of death is proportional with the crime of first degree murder. State v. Hall, 958 S.W.2d 679 (Tenn. 1997). A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." Id. (citing State v. Ramsey, 864 S.W.2d 320, 328 (Mo. 1993)). A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. State v. Bland, 958 S.W.2d 651 (Tenn. 1997) (citing State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986)). Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Bland, 958 S.W.2d at 665. Our duty "is to assure that no aberrant death sentence is affirmed." Id. (citing State v. Webb, 238 Conn. 389, 680 A.2d 147, 203 (Conn. 1996)).
>
> Our proportionality review is neither a rigid nor an objective test. Hall, 958 S.W.2d at 699. There is no "mathematical formula or scientific grid," and we are not bound to consider only cases in which the same aggravating circumstances were found applicable by a jury. Id.; State v. Brimmer, 876 S.W.2d 75, 84 (Tenn. 1994). This Court considers many variables when choosing and comparing cases. Bland, 958 S.W.2d at 667. Among these variables are: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and

mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. Id.; Hall, 958 S.W.2d at 699. Factors considered when comparing characteristics of defendants include: (1) the defendants' prior criminal record or prior criminal activity; (2) the defendants' age, race, and gender; (3) the defendants' mental, emotional or physical condition; (4) the defendants' involvement or role in the murder; (5) the defendants' cooperation with authorities; (6) the defendants' remorse; (7) the defendants' knowledge of helplessness of victim(s); and (8) the defendants' capacity for rehabilitation. Id.

State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998).

We have compared the circumstances of the present case with the circumstances of similar first degree murder cases and conclude that the penalty imposed in the present case is not disproportionate to the penalty imposed in similar cases. See e.g., State v. Reid, 91 S.W.3d 247 (Tenn. 2002) (imposing the death penalty where the defendant shot two victims during a robbery upon finding aggravating circumstances (i)(2), (i)(6) and (i)(7), despite substantial evidence of the defendant's troubled childhood); State v. Sims, 45 S.W.3d 1 (Tenn. 2001) (imposing the death penalty upon finding aggravating circumstances (i)(2), (i)(6) and (i)(7) where the twenty-four-year old African-American defendant shot the victim in the head and other parts of the body during a burglary); State v. Hall, 976 S.W.2d 121 (Tenn. 1998) (imposing the death penalty upon finding aggravating circumstances (i)(2), (i)(6) and (i)(7) where defendants murdered their victims by shooting and stabbing them and stole the victims' automobile); and State v. Bates, 804 S.W.2d 868 (Tenn. 1991) (imposing the death penalty upon finding aggravating circumstances (i)(2), (i)(6) and (i)(7) where the defendant took the victim to a wooded area and shot her in the head). After reviewing these cases and others not specifically cited, we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed by the jury for similar crimes.

## CONCLUSION

In accordance with Tenn. Code Ann. § 39-13-206(c), we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that the sentence is not disproportionate. We have also reviewed all issues raised by the appellant. We find no error. As a result, the judgments of the trial court and the sentence of death imposed by the jury are AFFIRMED.

_____
DAVID H. WELLES, JUDGE